**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BRIDGET HOLMES-MERGUCZ,<br><br>        Plaintiff,<br><br>v.<br><br>CELLCO PARTNERSHIP d/b/a VERIZON,<br><br>        Defendant. | Civil Action No. 18-11816 (FLW)<br><br>**OPINION** |

**WOLFSON, Chief Judge:**

In this employment discrimination suit, Plaintiff Bridget Holmes-Mergucz ("Plaintiff" or "Ms. Holmes-Mergucz"), alleges that her former employer, Defendant Cellco Partnership d/b/a Verizon ("Defendant" or "Verizon") discriminated and retaliated against her on the basis of her disability and request for accommodation, in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*; the Americans with Disabilities Act, as amended ("ADA"), 42 U.S.C. § 12101 *et seq.*; and the New Jersey Law Against Discrimination, N.J.S.A. § 10:5-3, *et seq.* ("NJLAD").  Verizon now moves for summary judgment pursuant to Fed. R. Civ. P. 56.  For the reasons set forth below, Verizon's motion for summary judgment is **GRANTED**.

**I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

The following facts are undisputed, unless otherwise noted.  This matter arises from Verizon's termination of Plaintiff in December 2017, from her Engineer I-RE/Regulatory position.  *See generally* ECF No. 16, Am. Compl.  Initially, Plaintiff was hired as a Telesales Representative by Verizon, a telecommunications company headquartered in Bedminster, New Jersey, on October

4, 2012; she began a new role[1] in an Engineer I-RE/Regulatory position on or about June 7, 2015. ECF No. 58-3, Def. SOMF ¶¶ 25 and 33.  In her role as Telesales Representative, Plaintiff was responsible for facilitating incoming sales calls.  Pl. Dep., Pl. Opp. Ex. B at 29:10 to 20.  As an Engineer I-RE, Plaintiff's role included the review of "abstracting contracts."  *Id.* at 70:19 to 21.

From October 2012 to June 2015, during her time as a Telesales Representative, Verizon claims that Plaintiff's supervisors, including Robert Cioffi and Brenden Collins, noted several "performance issues" related to Plaintiff's work, including missed quotas and difficulties achieving customer satisfaction goals and other metrics.  *Id.* at ¶¶ 26-33.[2]  For example, although Plaintiff did not receive a performance review in 2012, because she was considered a new employee at that time, her manager noted some performance concerns, including "Plaintiff's call efficiency issues and communication issues, such as being professional and courteous on calls." *Id.* at ¶ 26.  In 2013, Plaintiff received a performance rating of "Developing" at her Year-End Performance Review,[3] which meant that her "[p]erformance did not meet objectives, requirements and expectations; some or all objectives were not met and improvement is needed."  *Id.* at ¶ 28. Two years later, in April 2015, Plaintiff was also placed on a thirty-day performance improvement plan ("PIP"), because she was ranked 176 out of 180 Telesales Representatives on Verizon's Consumer Team.  *Id.* at ¶ 30.  This PIP was renewed for another thirty-day period in May 2015, after Plaintiff was ranked 169 out of 176 Telesales Representatives.  *Id.* at ¶ 31.

---

[1]    The Court notes that while Verizon characterizes this change in position as a "transfer," Plaintiff classifies it as a promotion.

[2]    Plaintiff does not contest the results of her yearly performance reviews from 2012 to 2014, nor does she contest that she was placed on a performance improvement plan in 2015; however, Plaintiff argues that her performance as a Telesales Representative is irrelevant to this case because those performance reviews "did not factor into Defendant's stated reason for terminating Plaintiff's employment in any way."  Pl. Resp. SOMF ¶¶ 26-33.

[3]    Employees are ranked in four potential categories: leading, performing, developing, or new to role.  DiSanto Dep., Pl. Opp. Ex. L at 49:15-22.

On June 7, 2015, Plaintiff began her new role as an Engineer I-RE, in which she provided regional and area support for all network lease-related issues. *Id.* at ¶ 33. In this new position, Plaintiff was supervised by David DiSanto ("DiSanto") and Margaret Salemi ("Salemi"). *Id.* According to Verizon, from June 2015 to May 2016, Plaintiff also performed poorly in this new role. *Id.* at ¶ 34. Specifically, Verizon claims that Plaintiff exhibited "unprofessional tone and behavior," failed to submit her timesheet and other reports on several occasions, worked non-approved overtime, left work early without notifying superiors, and received multiple notices regarding the inappropriate streaming of audio and video at work. *Id.* at ¶¶ 35 and 38. On September 15, 2015, DiSanto emailed Verizon's Human Resources department, stating: "I am seeing a continued pattern of behavior where [Plaintiff] is not meeting expectations with the team nor communicating effectively with the managers and peer group." *Id.* at ¶ 37. Several months thereafter, at her 2015 Year-End Performance Review, Plaintiff received an overall rating of "Performing." *Id.* at ¶¶ 40-41.

### A.    Medical Leave and Receipt of Workplace Accommodation

On May 23, 2016, Plaintiff was injured in an automobile accident. Def. SOMF ¶ 42. As a result of the accident, Plaintiff sustained a broken femur and other injuries, which required hospitalization, surgery, and weeks of rehabilitation. *Id.* at 43. During the time following her accident, Verizon granted Plaintiff's requests for leave and accommodations, including twelve weeks of medical leave from May 23, 2016 to August 16, 2016, under the FMLA and New Jersey Family Leave Act, short-term disability benefits, an additional three and a half months, from August 17, 2016 through December 5, 2016, of ADA-leave beyond Plaintiff's FMLA entitlement, and various degrees of work-from-home accommodation. *Id.* at 44.

As it relates to Plaintiff's work-from-home accommodation, Plaintiff's and Defendant's version of the facts diverge slightly.  According to Plaintiff, she originally anticipated working from home only until January 15, 2017; however, she requested at least two extensions of the accommodation.  ECF No. 62-1, Pl. Suppl. SOMF ¶¶ 10-13.  Indeed, the parties agree that Plaintiff was first permitted to work entirely from home at the conclusion of her medical leave, because Plaintiff's doctor indicated that she was limited in her ability to walk, drive, sit for extended periods, and that Plaintiff's leg needed to be elevated.  Def. SOMF ¶ 44; Pl. Resp. SOMF ¶ 44.  Thereafter, in March 2017, Verizon modified Plaintiff's work-from-home accommodation to permit Plaintiff to work from home four days per week.  Def. SOMF ¶ 44.  Finally, in June 2017, Verizon again modified Plaintiff's work-from-home accommodation to permit Plaintiff to work from home three days per week.  *Id.*  Plaintiff worked from home three day per week, in accordance with the accommodation granted in June 2017, until she was terminated in December 2017.  *Id.*

According to Plaintiff, however, these requests to work from home, while granted, were not supported by her supervisors at Verizon.  Pl. Suppl. SOMF ¶¶ 2-27.  Specifically, Verizon's HR consultant, Jason Foeshel ("Foeshel") testified at his deposition that Verizon was "uncomfortable with the whole work from [home] process from the get-go," and Plaintiff testified that DiSanto informed her that Salemi felt as though Plaintiff was "milking the system" by not coming to work on a daily basis.  *Id.* at ¶¶ 9, 14, and 21; *see also* Ex. K to Pl. Opp. at 77:1 to 10; Ex. B to Pl. Opp. at 156:20-157:14.

**B.**   **Plaintiff's Performance Post-Medical Leave**

Following Plaintiff's accident, Verizon claims that her performance issues at work continued.  Def. SOMF ¶ 47.  In that regard, Plaintiff's 2016 Year-End Performance Review, which gave her an overall rating of "Performing," noted that Plaintiff "missed key Terminations

and Renewals which are critical to the business and her core work responsibilities," that Plaintiff's supervisors held meetings with her in February and May 2016 to address "professionalism in the workplace," and that Plaintiff had attended team meetings unprepared or late. *See* 2016 Year-End Performance Review, Declaration of Gregory T. Alvarez, Esq. in Support of Def.'s Motion for Summary Judgment ("Alvarez Decl.") at Ex. 34. Further, the 2016 Year-End Performance Review identified that "[t]here is a systematic issue with missing, incorrect, or inaccurate work being performed." *Id.* Likewise, Plaintiff's 2017 Mid-Year Evaluation noted that she continued to have "communication issues with the team," including issues with "respectful workplace communications," and her overall error rate of 19.25% was "significantly higher than the 6% tolerable threshold." *See* 2017 Mid-Year Evaluation, Alvarez Decl. at Ex. 35. In addition, the 2017 Mid-Year Evaluation also identified positive attributes displayed by Plaintiff in the workplace, including that "[Plaintiff] has the ability to work with all levels of the organization and has shown that she engages well with peers to foster [and] adopt a positive culture with the team." *Id.* Further, the 2017 Mid-Year evaluation commented: "If [Plaintiff] can demonstrate a mastery of the subject matter she is assigned while contributing positively to the workplace, she can improve upon the 1st half of the year and end the year more favorable." *Id.* According to Plaintiff, the negative comments made by DiSanto throughout her 2016 Year-End Performance Review and her 2017 Mid-Year Evaluation were false and misrepresented her workplace performance. Pl. Resp. SOMF ¶¶ 47-54.

Following her 2017 Mid-Year evaluation, Plaintiff was placed on a forty-five day Action Plan in June 2017. Def. SOMF ¶ 55. The Action Plan included several "action items" or objectives for Plaintiff during the Action Plan's forty-five day period. *See* Action Plan, Alvarez Decl. at Ex. 37. For example, among other things, the Action Plan called for Plaintiff to "[m]aintain accurate

company records," "[c]ommunicate professionally," [m]aintain an error rate below 6% for work submitted and reviewed by QC," and "[c]omplete timesheets accurately per hours worked." *Id.*

### C. **Verizon's RIF and Plaintiff's Termination**

In October 2017, Verizon conducted a company-wide reduction in force ("RIF"). Def. SOMF ¶ 65. In that regard, Salemi was advised that Verizon would need to reduce its workforce to meet budgetary initiatives and that, as a result, she was required to reduce the number of employees in the department where Plaintiff worked. *Id.* at ¶ 67. Following Verizon's evaluation, three employees, including Plaintiff, were identified as having scored the lowest in Plaintiff's department on Verizon's RIF "Rate and Rank" evaluation. *Id.* at ¶ 72. On November 16, 2017, Verizon notified the three lowest scoring employees, including Plaintiff, that they were impacted by the RIF, and that their employment would be terminated on December 30, 2017, unless they found a new position at the company by December 29, 2017. *Id.* at ¶ 80.

Following the news of her anticipated termination, Plaintiff applied for three positions at Verizon; however, her candidacy was rejected with respect to each opening. *Id.* at ¶ 87. Thus, because Plaintiff did not secure another position with Verizon, her employment was terminated effective December 30, 2017. *Id.* at ¶ 88.

### D. **Procedural History**

On July 19, 2018, Plaintiff filed a three-count Complaint against Defendant, asserting claims of disability discrimination, retaliation, and hostile work environment under the ADA, NJLAD, as well as retaliation and interference under the FMLA. *See* ECF No. 1.

On November 16, 2018, Plaintiff filed an Amended Complaint, asserting additional allegations of refusal to hire in violation of the ADA, NJLAD and FMLA. *See* ECF No. 16. Specifically, as it relates to her ADA and NJLAD claims, Plaintiff alleges she was subjected to

discrimination, retaliation and hostile work environment "because of: (1) her known and/or perceived health problems; (2) her record of impairment; and/or (3) her requests for reasonable accommodations." *Id.* at ¶¶ 38-59.

On December 22, 2020, Verizon filed the instant Motion for Summary Judgment.  ECF No. 58.  In response, Plaintiff filed opposition on January 29, 2021, in which she expressly abandoned her claims for failure to rehire, hostile work environment and interference under the FMLA.  ECF No. 62.  Accordingly, the following claims remain: (1) disability discrimination and retaliation under the ADA, (2) disability discrimination and retaliation under the NJLAD, and (3) retaliation under the FMLA.  (Pl. Opp. Br. at 1.)

## II.   <u>LEGAL STANDARD</u>

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable [factfinder] could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248.  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting

*Anderson*, 477 U.S. at 255); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial." *Id.* at 331. On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof

concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

## III.   <u>DISCUSSION</u>

Each of Plaintiff's state and federal claims are governed by the three-step burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010) (ADA discrimination); *Victor v. State*, 203 N.J. 383, 408 (2010) (NJLAD discrimination); *Stouch v. Twp. of Irvington*, 354 F. App'x 660, 667 (3d Cir. 2009) (ADA retaliation); *Craig v. Suburban Cablevision, Inc.*, 140 N.J. 623, 629-30 (1995) (NJLAD retaliation); *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 301-02 (3d Cir. 2012) (FMLA retaliation).

Under this framework, Plaintiff first bears the burden to establish a *prima facie* case of discrimination or retaliation.  "To establish a *prima facie* case of discrimination under the ADA and NJLAD, a plaintiff must show: (1) he is a disabled person within the meaning of the ADA [or NJLAD]; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Marino v. Adamar of Jersey, Inc.*, No. 05-4528, 2009 U.S. Dist. LEXIS 7893, at *6-7 (D.N.J. Feb. 3, 2009) (internal quotations omitted). Similarly, to establish a prima facie case of retaliation under the ADA and LAD, a plaintiff must show: (1) she engaged in a protected activity; (2) she was thereafter subjected to an adverse employment action; and (3) there was a causal connection or link between the two.  *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997); *Romano v. Brown & Williamson Tobacco Corp.*, 284 N.J. Super. 543, 548-49 (App. Div. 1995).  Lastly, to succeed on an FMLA retaliation claim, a plaintiff must show that "(1) she invoked her right to FMLA-qualifying leave, (2) she suffered

an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 301-02 (3d Cir. 2012).

Next, if Plaintiff establishes a *prima facie* case under the ADA, NJLAD, or FMLA, the burden shifts to Defendant to articulate a legitimate business reason for the adverse employment action. *Dodson v. Coatesville Hosp. Corp.*, 773 F. App'x 78, 80 (3d Cir. 2019); *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2015). "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

Third, assuming Defendant articulates a legitimate, non-discriminatory explanation, Plaintiff bears the final burden to demonstrate that Defendant's proffered reasoning was a mere pretext through evidence that the provided rationale was false or that the real reason for the adverse action was discriminatory or retaliatory animus. *Dodson*, 773 F. App'x at 80; *Daniels*, 776 F.3d at 193. To do so, the plaintiff must "point to some evidence…from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* (quoting *Fuentes*, 32 F.3d at 764).

At the outset, Verizon does not dispute that Plaintiff is disabled within the meaning of the ADA or NJLAD. Moreover, while Verizon argues that Plaintiff cannot make a *prima facie* showing of discrimination or retaliation under the ADA, NJLAD, or FMLA because negative performance evaluations, action plans, and "nit-picking" by supervisors do not constitute legally cognizable adverse employment actions, an element required for all claims, Plaintiff clarifies that she is not asserting that these individual actions are standalone claims. Rather, Plaintiff asserts

that these actions provide "support to the causal connection in her claims that she was terminated due to her disability and in retaliation for requesting accommodation/utilizing leave as well as to show pretext." (Pl. Opp. Br. at 4.)  Therefore, the only adverse employment action which Plaintiff bases her claims under the ADA, NJLAD, and FMLA is her termination.  In that regard, Verizon does not dispute that Plaintiff's termination qualifies as an adverse employment action.  Thus, on this motion, the only basis on which Verizon challenges Plaintiff's *prima facie* case is the causal connection between her disability, request for leave, and accommodations and her termination—a common element amongst claims for discrimination and retaliation under the ADA, NJLAD, and FMLA.  *See Tielle v. Nutrition Grp.*, 810 F. App'x 160, 162-63 (3d Cir. 2020).  Because each of Plaintiff's claims require a causal connection to establish a *prima facie* case, the Court will address the claims together.

In *Kachmar v. SunGard Data Sys.*, 109 F.3d 173, 177 (3d Cir. 1997), the Third Circuit explained that proof of a causal connection between a protected activity and an adverse employment action, like termination, involves a highly specific inquiry into the motives of an employer and may be established in a number of ways.  "Causation may depend on the temporal proximity between the employee's protected activity and the adverse employment action." *Jackson v. Trump Ent. Resorts, Inc.*, 149 F. Supp. 3d 502, 509 (D.N.J. 2015) (citing *Kachmar*, 109 F.3d at 177).  Temporal proximity can serve as circumstantial evidence "sufficient to raise the inference that [the plaintiff's] protected activity was the likely reason for the adverse action." *Kachmar*, 109 F.3d at 177 (quoting *Zanders v. Nat'l R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir.1990)).  Absent temporal proximity, "circumstantial evidence of a 'pattern of antagonism' following the protected conduct can also give rise to the inference." *Id.* Temporal proximity and a pattern of

antagonism, however, "are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference." *Id.*

The Court first looks to the temporal connection.  "In certain narrow circumstances, an 'unusually suggestive' proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection." *Wright v. Providence Care Ctr., LLC*, 822 F. App'x 85, 94–95 (3d Cir. 2020) (quoting *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007)).  "Where the time between the protected activity and adverse action is not so close as to be unusually suggestive of a causal connection standing alone, courts may look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee[.]" *Marra*, 497 F.3d at 302.

Here, Plaintiff does not dispute that the record lacks evidence of a temporal connection between her leave and subsequent work-from-home accommodations and her termination.  *See* Pl. Opp. Br. at 8-9.  Plaintiff was injured on May 23, 2016, and as a result, she took twelve weeks of FMLA leave from May 23, 2016 to August 16, 2016.  Thereafter, following an additional three and a half months of ADA-leave, Plaintiff's leave concluded on December 5, 2015.  Shortly thereafter, Verizon granted Plaintiff's work-from-home request such that from December 2015 until her termination on December 30, 2017, Plaintiff worked from home in some capacity. Clearly, this timing does not raise an inference of causation.  *See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) ("Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment."); s*ee also Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004), superseded by statute on other grounds as stated in *Robinson v. First*

*State Cmty. Action Agency*, 920 F.3d 182, 187-89 & n.30 (3d Cir. 2019) (holding that a lapse of over two months between protected activity and adverse employment action "is not so close as to be unduly suggestive" of retaliation) (citation omitted); *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (finding a three week gap between protected activity and adverse employment action not unduly suggestive of retaliation); *Duncan v. Chester Cty. Hosp.*, 677 F. App'x 58, 62 (3d Cir. 2017) (finding that a thirty-four day gap between requested FMLA leave and termination was not unduly suggestive of retaliation).

Absent temporal connection, the Court considers whether Plaintiff has demonstrated a sufficient period of "intervening antagonism," or if whether the record, as a whole, establishes causation. *LeBoon*, 503 F.3d at 232. To make this determination, "courts consider 'a broad array of evidence.'" *Incorvati v. Best Buy Co.*, No. 10-1939, 2013 WL 3283956, at *5 (D.N.J. June 27, 2013). Importantly, "it is incumbent upon the employee to demonstrate that the antagonistic behavior began after the FMLA request was made." *Id.* (Comparing *Randler v. Kountry Kraft Kitchens*, No. 11–474, 2012 WL 6561510 at *12 (M.D.Pa. Dec.17, 2012) (rejecting plaintiff's causation argument in part because the alleged antagonistic behavior towards plaintiff, taking the form of "jokes and remarks," was "not markedly different from the incidents [the plaintiff] experienced prior to her" engaging in protected activity) with *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 289 (3d Cir. 2001) (crediting plaintiff's evidence of ongoing antagonism in light of evidence of plaintiff's superior's "change in demeanor after [plaintiff engaged in protected activity]"). In addition, inconsistencies or discrepancies in the employer's articulated reasons for terminating the employee may be sufficient to support an inference of causation. *LeBoon*, 503 F.3d at 232; *Abramson*, 260 F.3d at 290. When considering any circumstantial evidence of causation, the Court is to lend "a careful eye to the specific facts and

circumstances encountered." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 n. 5 (3d Cir. 2000); *see also Robinson v. Southeastern Pennsylvania Transp. Auth., Red Arrow Div.*, 982 F.2d 892, 895 (3d Cir. 1993) (deeming trial court's finding of a causal link not to be clearly erroneous when evidence was presented that the plaintiff was subjected to "a constant barrage of written and verbal warnings ..., inaccurate point totalings, and disciplinary action, all of which occurred soon after plaintiff's initial complaints and continued until his discharge") (Title VII discrimination case); *Marra*, 497 F.3d at 304-05 (finding causation based on pattern of antagonism when, after engaging in protected activity, plaintiff's computer was vandalized and never adequately investigated, plaintiff was excluded from an important meeting, one of his subordinates was assigned away from him against his will, and plaintiff's superior gave him a look of disgust upon learning of his participation in the protected activity).

In support of her argument that a causal connection has been established through a "pattern of antagonism," Plaintiff highlights evidence of purported "discriminatory remarks from management," including "resistance and pushback" from DiSanto and Salemi regarding her work-from-home accommodation; denied overtime due to Plaintiff's FMLA leave;[4] attempts by DiSanto to "discipline Plaintiff directly in the context of her work-from-home accommodation;" and general harassing and hostile behavior by DiSanto following Plaintiff's return from medical leave and immediately upon the commencement of her work-from-home accommodation. Having reviewed the evidence, however, the Court finds that no reasonable jury could find a causal

---

[4]     Plaintiff argues that Salemi precluded her from working overtime because she was on FMLA. However, the record is clear that Salemi and DiSanto had concerns about Plaintiff working overtime to complete work that should have been completed during regular hours. Salemi Dep., Pl. Opp. Ex. D at 113:5-114:2; 114:17-23. Notably, documentary evidence also shows that these overtime issues existed prior to her disability, leave, and accommodation. *See* Def. SOMF ¶¶ 35(d), 38; Alvarez Decl. at Ex. 20.

connection between Plaintiff's medical leave and subsequent work-from-home accommodations and her eventual termination.

Initially, Plaintiff relies on email correspondence between DiSanto and Verizon's Human Resources Department, as well as testimony from Foeshel regarding Verizon's internal impressions of Plaintiff's work-from-home request, to show a general lack of support from the company for her accommodations. Specifically, Plaintiff relies solely on an email dated August 16, 2016, from DiSanto to Kelly Cruz ("Cruz"), a member of Verizon's Human Resources Department, in which DiSanto wrote that his initial reaction to Plaintiff's work-from-home accommodation was "no." DiSanto Dep., Pl. Opp. Ex. L at 151:16 to 153:13. The record demonstrates, however, that Plaintiff mischaracterizes this email and that on its face, DiSanto's reaction was innocuous. Instead, his initial reaction was founded in legitimate, practical business concerns related to the proposed work-from-home accommodation, including logistical[5] and performance monitoring concerns. DiSanto Dep., Pl. Opp. Ex. L at 153:18 to 20. Indeed, in the email to Cruz, DiSanto expressly states that he was "open to hav[ing] [a] conversation [about her working from home]," so long as a plan existed to address his concerns regarding the inability to mail and print letters, and the ability to measure, control or report on the progress of Plaintiff's work. This sentiment is also consistent with DiSanto's testimony, in which he explained: "[P]rior to [Plaintiff] going out [on medical leave], we had difficulties measuring, monitoring and controlling her work and her performance," and as such, "if I have that limitation in the office, I'm

---

[5]     With respect to logistical concerns, Plaintiff's job as an Engineer-I often required her to submit renewals using a specific mode of transport, *i.e.*, US Postal Service, FedEx, or UPS. DiSanto testified that initially he had concerns about Plaintiff's ability to access these shipping providers, particularly given that her medical disability limited her mobility and ability to drive a car. DiSanto Dep., Pl. Opp. Ex. L at 130:4 to 15.118:3 to 17; *see also* Foeshel Dep., Pl. Opp. Ex. K at 67:1 to 68:24.

going to have a further limitation to the ability to measure, monitor and control" with Plaintiff working from home. *Id.* at 114:15 to 115:10. DiSanto further testified, and Plaintiff's performance reviews corroborate, that Verizon had "difficulties reaching [Plaintiff] on instant messenger when she was in the office," and therefore, he was concerned that these same issues would be exacerbated if Plaintiff worked from home.[6] *Id.* at 119:10 to 18.

Indeed, Plaintiff's prior performance record, including her year-end reviews from 2012 through 2015, supports DiSanto's concerns.   For example, in 2013, Plaintiff received a performance rating of "Developing," which meant that her "[p]erformance did not meet objectives, requirements and expectations; some or all objectives were not met and improvement is needed." Thereafter, approximately one year prior to her medical leave, Plaintiff was placed on a thirty-day performance improvement plan, because she was ranked 176 out of 180 Telesales Representatives on Verizon's Consumer Team.  This PIP was then renewed for another thirty-day period in May 2015, after Plaintiff's rank only marginally improved.  Moreover, the record includes numerous pre-medical leave emails which show a pre-existing pattern of performance-related issues, including Plaintiff's failure to submit her timesheet on time, failure to obtain approval before working overtime, failure to provide appropriate documentation for overtime hours, failure to meet key performance indicators ("KPIs"),[7] and instances of "aggressive" or "disrespectful" communication.  *See* Def. SOMF ¶¶ 35-38.   In one instance, prior to Plaintiff's medical leave, DiSanto emailed Verizon's Human Resources Department in September 2015, stating, in part: "I

---

[6]    The Court also notes that it appears Verizon did, in fact, have issues with Plaintiff checking in, being accessible, and appearing online while working from home during her accommodation period.  DiSanto Dep., Pl. Opp. Ex. L at 130:4 to 15.

[7]    Regarding the KPIs, an objective metric used by Verizon to track employee performance, Plaintiff only closed one item in October 2015 and thirty-five between November 19, 2015 and December 16, 2015, both of which did not meet Verizon's KPI expectation of five per day. *See* Alvarez Decl., Ex. 19 at D-1958, D-2007.

am seeing a continued pattern of behavior where [Plaintiff] is not meeting expectations with the team nor communicating effectively with the managers and peers." *See* DiSanto September 15, 2015 Email, Alvarez Decl. at Ex. 20.  In that same email, DiSanto also lists occasions when he met or had discussions with Plaintiff, as well as several specific concerns surrounding Plaintiff's performance.  *Id.*  These performance-related issues were the same issues that concerned DiSanto about Plaintiff's ability to effectively work from home.  Indeed, DiSanto testified that "[e]very concern that I had before her [medical leave] was the same concern that I had there.  There was nothing transformative about what had taken place.  Her working from home was just as problematic as her working in the office."  DiSanto Dep., Pl. Opp. Ex. L at 120:14 to 18.  Thus, it is clear from the evidence in the record that DiSanto's apprehensions related to Plaintiff's accommodation were based solely on legitimate performance-related concerns, not a hostile or discriminatory intent as a result of Plaintiff's medical disability.  As a matter of law, Plaintiff cannot rely on her impression of Defendant's hostility.  Rather, she must present objective evidence to show that DiSanto's exhibition of hostility towards her medical leave and accommodation such that one could raise a genuine issue of material fact.  *Solomon v. Soc'y of Auto. Engineers*, 41 F. App'x 585, 586 (3d Cir. 2002) (affirming summary judgment because the only evidence to support Plaintiff's claim of reverse gender discrimination was his own testimony); *Rouse v. Hudson Cty. Dep't of Fam. Servs.*, No. 15-1511, 2019 WL 2083301, at *6 (D.N.J. May 13, 2019).

In addition, Plaintiff emphasizes Foeshel's testimony that Verizon's management was "uncomfortable" with the arrangement for the entire time Plaintiff worked from home, *see* Foeshel Dep., Pl. Opp. Ex. K at 77:20-78:2, and that once it became clear that the accommodation was not going to be temporary, Verizon expressed that it would not support the accommodation long-term.

*Id.* at 47:12-20; 60:5-63:1-15; 65:21-66:5. This testimony, alone, however, is insufficient to find a pattern of antagonism, because the record is clear that Verizon approved Plaintiff's request to work-from-home, as well as several subsequent extensions of the accommodation, following her return from medical leave. *See Jones v. Serv. Elec. Cable TV, Inc.*, 809 F. App'x 105, 111 (3d Cir. 2020) (affirming summary judgment on plaintiff's 2015 retaliation claim and finding that plaintiff could not show causal connection, noting, *inter alia*, that "despite any frustrations that Jones's supervisors voiced to one another, Service Electric consistently granted Jones's prior requests for leave, so we discern no pattern of antagonism"). And, to be sure, when asked whether he ever questioned Plaintiff's need for accommodation or the duration of the accommodation, DiSanto clarified, "[m]y only concern[s] that I ever vocalized were the ability to measure, monitor and control her work, not the duration [of the accommodation]," "if she needs it and she's working with tools and HR, that's what she should get." *Id.* at 124:18 to 125:1; 126:5 to 8. In that same connection, Tiffany Uriarte, a Senior Human Resources Manager at Verizon during Plaintiff's employment, testified that "[A]t some point [Plaintiff's supervisors] became somewhat indifferent because her performance was similar whether she was at the office or at home. […] [T]he same performance concerns existed regardless of where she was working." Uriarte Dep., Pl. Opp. Ex. E at 48:17 to 49:4.

Next, Plaintiff claims that DiSanto "made it difficult every single day with the constant harassment of her." *See* Pl. Opp. Br. at 11-12. Specifically, Plaintiff testified that DiSanto questioned why she could not come to work more days per week, informed her that Salemi felt as though Plaintiff was "milking the system" by not returning to the office on a daily basis, and that her relationship with DiSanto changed as a result of her accident and her work-from-home accommodation. Pl. Dep., Pl. Opp. Ex. B at 156:12-157:23. With respect to their changed

relationship, Plaintiff testified that DiSanto became demeaning, rude, aggressive, abrasive, and unprofessional toward Plaintiff. *Id.* at 233:4 to 20; 234:23 to 24; 235:4-236:5; 237:6 to 9. However, this evidence is undermined by Plaintiff's own testimony. Indeed, although Plaintiff initially testified that DiSanto yelled at her, she retreated from that testimony, clarifying that "he didn't scream, he just raised his voice to let me know in a stern way." Pl. Dep., Pl. Opp. Ex. B at 244:8-246:12. Further, Plaintiff testified that DiSanto did not use vulgar language and other workers similarly complained that DiSanto's "management style was very barbaric." *Id.* at 233:21 to 23; 243:24 to 244:3. Specifically, she admitted that "[e]veryone on the team that [Plaintiff] worked on, pretty much, experienced David," see *id.* at 246:1 to 15, demonstrating that DiSanto's attitude and demeanor were products of his personality and management style, rather than a response to Plaintiff's medical leave and need for accommodation. *Cf. Abramson*, 260 F.3d at 288 (holding that an inference of discrimination existed where a supervisor's demeanor toward the plaintiff "changed dramatically" after the plaintiff's complaint). Moreover, regardless of how DiSanto treated Verizon's other employees, Plaintiff was subject to several disciplinary actions by her supervisors prior to her medical leave and accommodations request, and "[a]n employee cannot easily establish a causal connection between [her] protected activity and the alleged retaliation when [she] has received significant negative evaluations before engaging in the protected activity." *Ross v. Gilhuly*, 755 F.3d 185, 194 (3d Cir. 2014). Here, Plaintiff can point to nothing else in the record to substantiate DiSanto's purportedly rude, harassing, and demeaning behavior toward Plaintiff, other than her own self-serving opinions and beliefs. *Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 263 (3d Cir. 2012) (finding that "[a]s a general proposition, conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment."). In fact, Cruz testified that she believed DiSanto "wanted to accommodate [Plaintiff's] request[,]

but he was concerned about how it was going to work." Cruz Dep., Pl. Opp. Ex. A at 52:18 to 24.

Accordingly, Plaintiff's statements, alone, are insufficient to defeat summary judgment,

particularly since on this issue, Plaintiff's testimony was inconsistent.

Finally, to the extent that Plaintiff points to correspondence from DiSanto to Verizon's

Human Resources Department in the early stages of Plaintiff's work-from-home accommodation,

which inquired whether DiSanto could issue a formal written warning to Plaintiff, as evidence of

antagonistic behavior, the Court rejects that argument.  *See* DiSanto Dep., Pl. Opp. Ex. L at 156:2-

158:2. That correspondence is tied directly to Plaintiff's unsatisfactory job performance both

before her medical leave and in the earlier days of her return to work.  Indeed, the email dated

December 15, 2016, from DiSanto to Cruz, shows that when Plaintiff was beginning her work-

from-home accommodation, she already disregarded DiSanto's instructions and requests.  DiSanto

Dep., Pl. Opp. Ex. L at 156:2-161:20; DiSanto Email Dated December 15, 2016, Alvarez Decl. at

Ex. 30.  As part of her return to work plan, DiSanto asked Plaintiff to (1) log on to her computer

when she was beginning work (since he could no longer see her physically arrive for work), and

(2) provide him with a daily roll up (a list of work items performed that day).  DiSanto Dep., Pl.

Opp. Ex. L at 156:2-161:20.  An email exchange between Plaintiff and DiSanto indicated that

Plaintiff did not comply with these requests, and as a result, DiSanto raised the idea to Human

Resources of a formal written warning.  Alvarez Decl. at Ex. 30.  Notwithstanding DiSanto's

inquiry, no actual warning was ever even issued.  Pl. Suppl. SOMF ¶¶ 27-28.  But, even if one had

been issued, Plaintiff cannot rely on it to defeat summary judgment. S*ee McCormick v. Allegheny*

*Valley Sch.*, No. 06-3332, 2008 U.S. Dist. LEXIS 8533, at *49-51 (E.D. Pa. Feb. 4, 2008) ("While

Ms. McCormick's written warning certainly occurred close to the date she requested FLMA leave,

one disciplinary event, *i.e.*, the receipt of written discipline, does not constitute harassment or antagonism").

Similarly, around that same time, in December 2016, DiSanto also requested that Verizon's Human Resources Department permit him to assign Plaintiff a "Developing" rating on her 2016 Year-End Review.  Cruz Dep., Pl. Opp. Ex. A at 57:2-3, 70:3-71:2.  While Plaintiff points to this request as evidence of antagonistic conduct, the Court disagrees.  Put simply, there is no evidence showing that DiSanto's basis for classifying Plaintiff as "Developing" was because of her medical leave nor her work-from-home accommodation.  Rather, the evidence is quite clear that DiSanto sought to assign Plaintiff a "Developing" rating based on her unsatisfactory job performance, which was supported by prior performance evaluations, email correspondence, and the testimony of DiSanto and Plaintiff's own version of the facts.

In sum, a reasonable jury could not conclude that a causal link existed between Plaintiff's termination and her request for medical leave under the FMLA or ADA, nor her request for accommodation related to her disability.  Rather, the record bore out that Verizon provided Plaintiff with three months of FMLA leave, as well as an additional three and a half months of ADA-leave, following her accident.  It is also undisputed that Verizon granted Plaintiff's request to work from home as a reasonable accommodation to her ongoing medical disability -- an accommodation which was then extended twice and lasted a total of thirteen months.   Stripping away Plaintiff's self-serving testimony and impression regarding management's hostility and the rude or demeaning conduct of her supervisor, the record is devoid of any evidence that her termination was a result of her request for leave or accommodation.  Rather, Verizon had considerable performance-based concerns with Plaintiff's work, which existed in advance of her disability, such that the company was reasonably apprehensive about the logistics and feasibility

of a work-from-home arrangement.  Further, these same performance-based issues continued after Plaintiff's medical leave and during her work-from-home accommodation period, culminating in her termination as part of a reduction in force initiative.[8]   As a result, Plaintiff cannot establish a *prima facie* claim for discrimination and retaliation under the ADA or NJLAD, nor can she establish a claim of retaliation under the FMLA.  Verizon is entitled to summary judgment.

## IV.  <u>CONCLUSION</u>

For the reasons set forth above, Verizon's motion for summary judgment is **GRANTED**.

Dated: July 27, 2021                                          /s/ Freda L. Wolfson
                                                             Freda L. Wolfson
                                                             U.S. Chief District Judge

---

[8]     The Court also notes that even if Plaintiff established a *prima facie* case of discrimination and retaliation under the ADA and the NJLAD and retaliation under the FMLA, Verizon has presented a legitimate business reason for Plaintiff's termination, which Plaintiff has not rebutted. Notably, Plaintiff admits that she was terminated by Defendant as part of a RIF that impacted hundreds of Verizon employees. Def. SOMF ¶ 80.  Indeed, the evidence demonstrates that Verizon followed the same "Rate and Rank" program and utilized the same neutral business-related criteria for Plaintiff that it used for all employees to determine who would be negatively impacted. Specifically, as part of the Rate and Rank process, employees were assigned numerical scores from 1 to 5 in various categories including, but not limited to job performance, skill, technical knowledge, adherence to company policy and prior corrective actions.  Plaintiff and two other employees from her functional group were selected for the RIF because they scored the lowest in their respective rate and ranks.  With respect to Plaintiff's functional group, the Rate and Rank process compared three employees: Plaintiff, Diane Hudack and Gail Sussman.  Of these three employees, Hudack and Plaintiff received the lowest overall scores, and were notified of their termination unless they found another role within the company.  Sussman was not negatively impacted by the RIF; however, Plaintiff acknowledges that she was not at the same "mastery level" as Sussman.  Pl. Dep., Pl. Opp. Ex. B at 201:12-24.  Further undermining Plaintiff's argument, the record shows that Sussman and another similarly situated employee, comparable to Plaintiff, had also taken medical leave during their employment with Verizon; however, neither of those employees were negatively impacted/terminated by the RIF.  Def. SOMF ¶ 84.